## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

CONN CREDIT I, LP,            §

                         §

    Plaintiff,          §       CIVIL ACTION NO. 1:14-cv-00429

                         §

v.                     §

                         §       Judge Ron Clark

TF LOANCO III, LLC,       §

                         §       JURY TRIAL DEMANDED

    Defendant.       §

## DEFENDANT TF LOANCO III, LLC'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant TF LoanCo III, LLC ("TFLoanCo") files this Motion for Partial Summary

Judgment against Plaintiff Conn Credit I, LP ("Conn").

### INTRODUCTION

In April and May of 2014, Conn sold 53,779 consumer debt accounts (the "Accounts") to

TFLoanCo in exchange for payment by TFLoanCo in the amount of $6,426,666.73.  The Accounts

reflected amounts owed by consumers who had purchased products at a Conn store on credit.  Conn

had charged-off[1] the Accounts and marketed the Accounts for sale through a Confidential Offering

Memorandum and bidding process.  TFLoanCo submitted the winning bid.

The parties' transaction was governed by a purchase and sale agreement, which

contemplated TFLoanCo's purchase of additional accounts in the future.  After the April and May

purchase, TFLoanCo discovered serious issues with the Accounts.  When it refused to close on

additional accounts in August of 2014, Conn commenced this lawsuit.  Conn asserted a claim

---

[1]     A "charge-off" is the determination by a creditor that a debt is difficult or unlikely to be collected, which supports a tax deduction for bad debts under Section 166 of the Internal Revenue Code.  Black's Law Dictionary treats "charge-off" as a verb, and defines it as follows: "To treat (an account receivable) as a loss or expense because payment is unlikely; to treat as a bad debt."  *Black's Law Dictionary* p. 249 (Bryan A. Garner ed. Deluxe 8th ed., West 2004).

against TFLoanCo for breach of contract, and TFLoanCo asserted counterclaims against Conn for breach of contract and fraud.

TFLoanCo seeks partial summary judgment that (1) Conn breached its representations and warranties contained in the parties' agreement as a matter of law; (2) TFLoanCo's "sole and exclusive remedy" for Conn's breach of its representations and warranties is Conn's repurchase of 35,609 out of the 53,779 Accounts, minus any amounts collected on those 35,609 Accounts by TFLoanCo; and (3) Conn's breach of contract claim fails as a matter of law.

### SUMMARY AND STATEMENT OF ISSUES

1. **ISSUE**:  Did Conn breach its representations and warranties with respect to 26,418 Accounts as a matter of law?

   For many Accounts, Conn sold consumers repair service agreements or extended warranties.  When Conn charged-off the Accounts, it cancelled the service and warranty agreements.  However, the law required Conn to credit back to the consumers' Account debt the prorated purchase price of the service or warranty product for any unearned/unused time period existing at the time of charge-off.  Conn failed to make these credits.  26,418 Accounts purchased by TFLoanCo had service and warranty agreements pending at the time the Accounts were charged-off.  Accordingly, these 26,418 Accounts had inaccurate and inflated balances, resulting in (i) TFLoanCo overpaying for Accounts (ii) that have serious problems under the Fair Debt Collection Practices Act and concomitant state laws.

2. **ISSUE**:  Did Conn breach its representations and warranties with respect to 13,996 Accounts as a matter of law?

   Conn represented to TFLoanCo that each Account was classified into one of four clearly defined pools or buckets: "Uncollected Charge-Offs"; "Fresh Forward Flows"; "Judgments"; or "Dismissed Bankruptcies."  For the purchase in April of 2014, Conn mischaracterized 12,963 Accounts.  For the purchase in May of 2014, Conn represented and agreed it would only sell Accounts designated as "Fresh Charge-Offs"; however, 1,033 Accounts were not "Fresh Charge-Offs."  Additionally, Conn represented that Accounts classified as "Uncollected Charge-Offs" and "Fresh Forward Flows" were charged-off in or after October 2013 and February 2014, respectively.  Yet, out of the 13,996 mischaracterized Accounts, TFLoanCo discovered 5,764 Accounts were "Uncollected Charge-Offs" or "Fresh Forward Flows" that had been charged-off from 1982 through September 2013.

2

3.    **ISSUE**: Does "sole and exclusive remedy" mean "sole and exclusive remedy," requiring Conn to repurchase the Accounts for which it breached its representations and warranties?

Section 9.4 of the PSA (entitled "**Repurchase of Accounts as Exclusive Remedy**") states that "[TFLoanCo] and [Conn] agree that, as to any breach by [Conn] of any of its representations or warranties in respect to any Account, [TFLoanCo]'s *sole and exclusive remedy* for damages … *shall be [Conn]'s repurchase of such Account*." (Emphasis added).

4.    **ISSUE**:  Because Conn breached its representations and warranties with respect to Accounts purchased by TFLoanCo in April and May of 2014, was TFLoanCo excused from closing on and purchasing additional accounts from Conn in August of 2014?

Section 10.2 of the PSA (entitled "**Conditions Precedent to Purchase or Sale of Accounts**") states:

> [Conn] and [TFLoanCo] will be obligated to transfer Accounts on a Closing Date *only if* (i) the representations and warranties of [TFLoanCo] or [Conn], respectively, in this Agreement are true and correct *as of such Closing Date*; and (ii) [TFLoanCo] or [Conn], respectively, has complied in all material respects with any obligation to be performed by it on or prior to such Closing Date.

(Emphasis added).

**SUMMARY JUDGMENT EVIDENCE**[2]

| Exhibit 1 | Purchase and Sale Agreement |
|---|---|
| Exhibit 2 | Confidential Offering Memorandum **[FILED UNDER SEAL]** |
| Exhibit 3 | Bill of Sale and Assignment of Accounts for the Bulk Delivery |
| Exhibit 4 | Settlement Statement for the Bulk Delivery |

---

[2]    Exhibits 3, 5 and 7 were large .PDF files.  Exhibit 3 contained an affidavit bill of sale, followed by a 537-page list of 43,367 Accounts conveyed to TFLoanCo.  Exhibit 5 contained an affidavit bill of sale, followed by a 93-page list of 4,785 Accounts conveyed to TFLoanCo.  Exhibit 7 contained an affidavit bill of sale, followed by a 121-page list of 5,627 Accounts conveyed to TFLoanCo.  In the spirit of Local Rules CV-5(a)(4) and CV-56(d), TFLoanCo is filing only the affidavit bills of sale and the first page of the Account lists, with the names of the consumer obligors redacted.  If the Court or Conn believes it is necessary to include the entire 537, 93 and 121 page account lists, TFLoanCo will supplement the record accordingly.  For all other exhibits, TFLoanCo has also redacted the names of any obligors contained therein, as well as Conn's bank account information contained in Exhibit 1.

| | |
|---|---|
| Exhibit 5 | Bill of Sale and Assignment of Accounts for Delivery (Flow) 1 |
| Exhibit 6 | Settlement Statement for Delivery (Flow) 1 |
| Exhibit 7 | Bill of Sale and Assignment of Accounts for Delivery (Flow) 2 |
| Exhibit 8 | Settlement Statement for Delivery (Flow) 2 |
| Exhibit 9 | Letter dated July 22, 2014 |
| Exhibit 10 | Letter dated August 27, 2014 |
| Exhibit 11 | Conn's Original Complaint against Sherman Originator III, LLC |
| Exhibit 12 | Sherman Originator III, LLC's Counterclaims against Conn |
| Exhibit 13 | Conn's Answers to TFLoanCo's Interrogatories |
| Exhibit 14 | "Trax accounts_100515.xlsx" (referred to herein as "Conn's Internal Data"), which is a Microsoft Excel spreadsheet that has been placed on a CD-Disk labeled "Exhibit 14" and mailed to the Court for inclusion in the record. *See* footnote 5. **[FILED UNDER SEAL]** |
| Exhibit 15 | Conn's email dated December 31, 2014 |
| Exhibit 16 | Declaration of Helga Zauner |
| Exhibit 16-1 | Expert Report of Helga Zauner **[FILED UNDER SEAL]** |
| Exhibit 17 | Conn spreadsheet labeled "Conn_trx 0163057.xlsx" |
| Exhibit 18 | Declaration of Michael A. Ackal, III |

### STATEMENT OF UNDISPUTED FACTS

### A.   Background Facts

On or about April 30, 2014, TFLoanCo and Conn entered into a Purchase and Sale Agreement (the "PSA").  *See* Exhibit 1.  The PSA set forth the parties' respective rights, duties, representations, warranties, and obligations concerning Conn's sale and TFLoanCo's purchase of Accounts originated, serviced, and collected by Conn.  *Id.*

4

Pursuant to a Confidential Offering Memorandum dated April 11, 2014, Conn described the portfolio of Accounts being offered for sale.  S*ee* Exhibit 2.  Conn represented the Accounts were categorized into four separate classifications or "pools":

| Pool | Account Status |
|------|----------------|
| Uncollected Charge-Offs | • Accounts that charged-off between October 2013 and January 2014 that have not been collected post-charge-off<br><br>• No exclusion reason, judgment, or dismissed [bankruptcy] |
| Fresh Forward Flow | • Accounts that charge-off February 2014 through January 2015 – delivered the month subsequent to charge-off (see proposed delivery schedule).<br><br>• No exclusion reason, judgment or dismissed [bankruptcy] |
| Judgments | • Accounts where Conn's obtained a judgment against an Obligor<br><br>• No exclusion reason or dismissed [bankruptcy] |
| Dismissed Bankruptcies | • Accounts where the bankruptcy case was dismissed. |

*See* Exhibit 2 at p. 4.

Under the PSA, Conn was to sell, and TF LoanCo was to purchase, the Accounts pursuant to a Delivery Schedule.  *See* Exhibit 1 at p. 2.  The Delivery Schedule contemplated a total of thirteen (13) deliveries from April 30, 2014 through February of 2015.  *Id.*

1.    The Bulk Delivery

The first delivery was the Bulk Delivery.  *Id.*  Conn represented and warranted that "the Bulk Delivery … consists of the following Account Classifications: 'Fresh Charge-Offs', 'Judgments' and 'Dismissed Bankruptcies', and … those are the only Account Classifications being purchased under the [Bulk Delivery]."  *Id.* at § 2.4.

Conn sold Accounts to TFLoanCo under the Bulk Delivery based on how each Account

5

was classified.  *Id*. at p. 3 (definition of "Purchase Price").  The purchase price for each Account was determined by multiplying certain percentages[3] to the outstanding Account balances.  *Id*. Payments made by consumers after an agreed cut-off date of March 13, 2014 were to be credited to the purchase price.  *Id*. at §§ 2.5(a) & 3.1.

On April 30, 2014 – the same day the parties' executed the PSA – Conn executed a Bill of Sale and Assignment of Accounts for the Bulk Delivery.  *See* Exhibit 3.  Under the Bulk Delivery, Conn sold and TFLoanCo purchased a total of 43,367 Accounts for a total purchase price of $4,976,674.66.  *See* Exhibit 4.  Of the Accounts sold in the Bulk Delivery, Conn classified 21,675 accounts as "Fresh Charge-Offs," 9,249 Accounts as "Judgments," and 12,443 Accounts as "Dismissed Bankruptcies."  *See* Exhibits 3 & 4.  In the Bill of Sale and Assignment of Accounts for the Bulk Delivery, and in the concomitant Settlement Statement, Conn represented the aggregate balances for the 43,367 Accounts was $78,961,330.34 (which was the basis from which the purchase price was to be calculated), with net post-cutoff payments in the aggregate amount of $37,369.34.  *See* Exhibits 3 & 4.

2.      Deliveries (Flows) 1 and 2

The second and third deliveries under the PSA were called "Delivery 1" (or "Flow 1") and "Delivery 2" (or "Flow 2").  These deliveries were scheduled to close on May 9, 2014.  *See* Exhibit 1 at p. 2.  Pursuant to Section 2.4 of the PSA, Conn:

> represent[ed] and warrant[ed] that all Accounts on each Account Schedule subsequent to the [Bulk Delivery] will represent all of the charged-off Accounts of [Conn] and its affiliates with only the "Fresh-Charge Off" Account Classification that have not otherwise

---

[3]      If an Account was a "Fresh Charge-Off," TFLoanCo was obligated to purchase the Account in an amount equal to 5.9427% of the Account's balance.  *Id*. at p. 3 (definition of "Purchase Price Percentage").  If the Account was classified as a "Judgment," TFLoanCo was obligated to purchase the Account in an amount equal to 4.8407% of the Account's balance.  *Id*.  And if the Account was classified as a "Dismissed Bankruptcy," TFLoanCo was obligated to purchase the Account in an amount equal to 9.7868% of the Account's balance.  *Id*.; *see also*, Exhibit 4 for the aforementioned Purchase Price Percentages.

6

been sold by [Conn] under [the PSA].

*Id*. at § 2.4.

TFLoanCo was required to purchase all Accounts sold by Conn under Deliveries 1 and 2 in an amount equal to 7% of the account's balance. *Id*. at p. 3 (definition of "Purchase Price Percentage"). Payments made by consumers after an agreed cut-off date of April 15, 2014 were to be credited to the purchase price. *Id*. at §§ 2.5(a) & 3.1.

On or about May 9, 2014, Conn executed a Bill of Sale and Assignment of Accounts for Delivery (Flow) 1 and Delivery (Flow) 2. *See* Exhibits 5 & 7. Under Delivery 1, TFLoanCo purchased a total of 4,785 Accounts for a total purchase price of $651,387.29. *See* Exhibit 6. Conn represented the Accounts were all "Fresh Charge-Offs." *See* Exhibits 5 & 6. In the Bill of Sale and Assignment of Accounts for Delivery 1, and in the concomitant Settlement Statement, Conn represented the aggregate balances for the 4,785 Accounts was $9,347,599.18 (which was the basis from which the purchase price was to be calculated), with net post-cutoff payments in the aggregate amount of $2,944.65. *See* Exhibits 5 & 6.

Under Delivery 2, TFLoanCo purchased a total of 5,627 Accounts for a total purchase price of $798,604.78. *See* Exhibit 8. Conn represented the Accounts were all "Fresh Charge-Offs." *See* Exhibits 7 & 8. In the Bill of Sale and Assignment of Accounts for Delivery 2, and in the concomitant Settlement Statement, Conn represented the aggregate balances for the 5,627 Accounts was $11,481,583.54 (which was the basis from which the purchase price was to be calculated), with net post-cutoff payments in the aggregate amount of $5,106.07. *See* Exhibits 7 & 8.

Accordingly, by May 9, 2014, the parties had closed on the first three Deliveries (the Bulk Delivery, Delivery 1 and Delivery 2) scheduled under the PSA, whereby Conn sold 53,779

7

Accounts to TFLoanCo for total payment to Conn in the amount of $6,426,666.73.  The next deliveries under the PSA (Deliveries 3, 4, 5, and 6) were scheduled to close on August 28, 2014. *See* Exhibit 1 at p. 2-3.

B.     **Procedural History**

Soon after TFLoanCo began attempting to service and collect on the Accounts, it discovered the Accounts Conn had originated and sold to TFLoanCo in the Bulk Delivery and Deliveries 1 and 2 suffered from serious issues, including the accuracy and reliability of the Account balances.  Accordingly, on or about July 22, 2014, TFLoanCo sent Conn a default letter. *See* Exhibit 9.

Thereafter, in August of 2014, representatives of TFLoanCo met with representatives of Conn to discuss problems and issues TFLoanCo was experiencing with the Accounts.  *See* Dkt. 12 at Exh. A, ¶ 16 (Declaration of Bryan Brewer).  After the meeting, TFLoanCo and Conn continued their discussions with respect to Conn's breaches in numerous phone calls, text messages, and emails.  *Id*. at ¶ 17.

The next deliveries under the PSA were scheduled to close on August 28, 2014.  On August 27, 2014, TFLoanCo notified Conn that it refused to close on additional accounts.  *See* Exhibit 10. But prior thereto, while TFLoanCo and Conn were attempting to negotiate a resolution, and without TFLoanCo's knowledge, Conn preemptively filed this lawsuit on Saturday, August 23, 2014 – five days prior to the next closing date.  *See* Dkt. 1.

Conn has asserted a claim for breach of contract against TFLoanCo for failing to close on Deliveries 3, 4, 5, and 6.  *See* Dkts. 1 & 5.  Conn seeks damages relating to the difference between the amounts for which it contends TFLoanCo should have purchased the remaining accounts under Deliveries 3-6, and the amounts for which Conn sold the remaining accounts to an entity called

8

Sherman Originator III, LLC ("Sherman").[4]

TFLoanCo has asserted counterclaims against Conn.  *See* Dkt. 35.  TFLoanCo contends

Conn breached several of its representations and warranties in the PSA.  *Id*.  TFLoanCo also alleges

Conn has committed fraud.  *Id*.  TFLoanCo seeks to enforce Section 9.4 of the PSA, which

unambiguously states:

> [TFLoanCo] and [Conn] agree that, as to any breach by [Conn] of
> any of its representations or warranties in respect to any Account,
> [TFLoanCo]'s ***sole and exclusive*** remedy for damages … arising
> out of such breach ***shall be [Conn]'s repurchase of such Account***.

*See* Exhibit 1 at § 9.4 (emphasis added).

### C.    The RSA Issue.

For many of the 53,779 Accounts purchased by TFLoanCo, Conn had sold to the consumer

a repair service agreement or extended warranty (collectively referred to as a "RSA") covering the

specific good that the consumer purchased.  *See* Exhibits 13 & 14.[5]  At the time Conn charged-off

the Accounts, Conn also cancelled/rescinded the RSAs, which was certainly within its rights.  *See*

Exhibit 15.  The problem, however, is that Conn categorically failed to credit back, refund, or

rebate to the Account debt the prorated purchase price of the cancelled/rescinded RSAs for any

unearned/unused time period existing at the time of charge-off, including the prorated portion of

---

[4]      Conn sued Sherman in the Eastern District of Texas on January 7, 2015, because after Conn sold the accounts to Sherman, Sherman refused to close on future deliveries.  *See* Exhibits 11 & 12.  Soon after Sherman purchased the accounts that Conn contends TFLoanCo was required to purchase, Sherman, like TFLoanCo, discovered the accounts suffered from serious issues.  *See* Exhibit 12.  The case was transferred to the Southern District of Texas, and Sherman has asserted counterclaims against Conn that are akin to the counterclaims asserted by TFLoanCo.  *Id*.

[5]      Exhibit 14 is Microsoft Excel spreadsheet that Conn produced on October 6, 2015.  The spreadsheet is named "Trax accounts_100515.xlsx" (referred to hereinafter as "Conn's Internal Data") and lists information for every Account sold to TFLoanCo.  When Conn's Internal Data is converted into a .PDF, it constitutes over 5,000 pages and is not in a usable or readable form.  Accordingly, TFLoanCo contacted the Clerk's office concerning filing the spreadsheet in its native format.  TFLoanCo was instructed to place the spreadsheet onto a CD-disk and mail the disk to the Court.  Accordingly, Conn's Internal Data has been placed on a CD-Disk labeled "Exhibit 14" and mailed to the Court for inclusion in the record.  TFLoanCo requests Exhibit 14 be kept under seal.

the applicable sales tax associated with the consumer's purchase of the RSA.  *Id*.

TFLoanCo's expert has reviewed Conn's Internal Data.  *See* Exhibits 14 & 16.  Conn's Internal Data includes information for each Account, including (1) the date Conn charged-off the Account, (2) whether a consumer purchased a RSA, and (3) the date the RSAs expired.  *See* Exhibit 14.

Based on Conn's Internal Data, TFLoanCo's expert determined that 26,418 out of the 53,779 Accounts sold by Conn to TFLoanCo had an unexpired RSA pending at the time Conn charged-off the Accounts.  *See* Exhibit 16 at ¶ 8.  To make this determination, the expert simply compared the expiration date of the RSA for each Account with the charge-off date for each Account.  *Id*.  26,418 Accounts had unexpired RSAs pending as of the date of charge-off.  *Id*.

TFLoanCo's expert also cross-referenced those 26,418 Accounts with the Bills of Sale for the Bulk Delivery, Delivery (Flow) 1 and Delivery (Flow) 2.  *See* Exhibit 16 at ¶ 9; *see also*, Exhibits 3, 5 & 7.  She was able to determine that TFLoanCo paid exactly $3,687,764.25 for those 26,418 Accounts. *See* Exhibit 16 at ¶ 9.

These conclusions of TFLoanCo's expert should be undisputed.   In fact, TFLoanCo requested in discovery that Conn identify the Accounts that had unexpired RSAs pending at the time Conn charged-off the Accounts, and on February 22, 2016, Conn produced a summary document.  *See* Exhibit 17.[6]  Conn identified 26,426 Accounts that had an unexpired RSA at the time of charge-off (*see id*.), which is eight (8) ***more*** than TFLoanCo's expert identified.  Moreover, Conn estimated that TFLoanCo purchased those 26,426 Accounts for $3,703,175.47, which is $15,411.22 ***more*** than what TFLoanCo's expert determined TFLoanCo paid for the 26,418

---

[6]        Conn produced Exhibit 17 as a Microsoft Excel spreadsheet labeled "Conn_trx 0163057.xlsx."  For purposes of this motion, TFLoanCo converted the spreadsheet into a .PDF file.

Accounts by specifically cross-referencing the RSA Accounts with the Accounts and purchase prices listed in the three Bills of Sale.

### D.     Misclassified Accounts.

TFLoanCo's expert has also determined that 13,996 Accounts have different Account Classifications in the Bills of Sale when compared to the Account Classifications in Conn's Internal Data.  *See* Exhibit 16 at ¶¶ 10-15.

Specifically, for the Bulk Delivery:

- 1,160 Accounts classified as "Fresh Charge-Offs" in the Bill of Sale for the Bulk Delivery are classified as "Judgments" in Conn's Internal Data.  *Id*. at ¶ 11.

- 1,332 Accounts classified as "Fresh Charge-Offs" in the Bill of Sale for the Bulk Delivery are classified as "Dismissed Bankruptcies" in Conn's Internal Data.  *Id*.

- Two (2) Accounts classified as "Fresh Charge-Offs" in the Bill of Sale for the Bulk Delivery are classified as "N/A" in Conn's Internal Data.  *Id*.

- 2,288 Accounts classified as "Judgments" in the Bill of Sale for the Bulk Delivery are classified as "Uncollected Charge-Offs" in Conn's Internal Data.  *Id*. at ¶ 12.

- 465 Accounts classified as "Judgments" in the Bill of Sale for the Bulk Delivery are classified as "Flow 2" in Conn's Internal Data.  *Id*.

- 2,173 Accounts classified as "Judgments" in the Bill of Sale for the Bulk Delivery are classified as "Dismissed Bankruptcies" in Conn's Internal Data.  *Id*.

- One (1) Account classified as a "Judgment" in the Bill of Sale for the Bulk Delivery is classified as "N/A" in Conn's Internal Data.  *Id*.

- 2,569 Accounts classified as "Dismissed Bankruptcies" in the Bill of Sale for the Bulk Delivery are classified as "Uncollected Charge-Offs" in Conn's Internal Data. *Id*. at ¶ 13.

- 574 Accounts classified as "Dismissed Bankruptcies" in the Bill of Sale for the Bulk Delivery are classified as "Flow 2" in Conn's Internal Data.  *Id*.

- 2,398 Accounts classified as "Dismissed Bankruptcies" in the Bill of Sale for the Bulk Delivery are classified as "Judgments" in Conn's Internal Data.  *Id*.

- One (1) Account classified as a "Dismissed Bankruptcy" in the Bill of Sale for the Bulk Delivery is classified as "N/A" in Conn's Internal Data.  *Id.*

For Deliveries (Flows) 1 and 2, Conn represented and warranted that "all Accounts … will represent all of the charged-off Accounts of [Conn] and its affiliates with only the 'Fresh Charge-Off' Account Classification …." *See* Exhibit 1 at § 2.4.  However, that was not the case.

- 229 Accounts classified as "Fresh Charge-Offs" in the Bill of Sale for Delivery (Flow) 1 are classified as "Judgments" in Conn's Internal Data. *See* Exhibit 16 at ¶ 14.

- 296 Accounts classified as "Fresh Charge-Offs" in the Bill of Sale for Delivery (Flow) 1 are classified as "Dismissed Bankruptcies" in Conn's Internal Data.  *Id.*

- 235 Accounts classified as "Fresh Charge-Offs" in the Bill of Sale for Delivery (Flow) 2 are classified as "Judgments" in Conn's Internal Data.  *Id.* at ¶ 15.

- 273 Accounts classified as "Fresh Charge-Offs" in the Bill of Sale for Delivery (Flow) 2 are classified as "Dismissed Bankruptcies" in Conn's Internal Data.

TFLoanCo's expert cross-referenced the 13,996 mischaracterized Accounts with the Account contained in the Bills of Sale for the Bulk Delivery, Delivery (Flow) 1, and Delivery (Flow) 2.  *Id.* at ¶ 16.  She determined that TFLoanCo paid exactly $1,645,556.38 for those 13,996 Accounts.  *Id.*

### E.   Old, Misrepresented Accounts.

Conn represented in its Confidential Offering Memorandum that the pool of Accounts included four distinct categories or "pools": "Uncollected Charge-Offs," "Fresh Forward Flows," "Judgments" and "Dismissed Bankruptcies."  *See* Exhibit 2 at p. 4.  Conn further represented that "Uncollected Charge-Off" meant: "Accounts that charge-off between ***October 2013*** and January 2014 that have not been collected post-charge-off" and that did not contain an "exclusion reason, judgment, or dismissed [bankruptcy]."  *Id.* (emphasis added).  "Fresh Forward Flow" meant: "Accounts that charge-off ***February 2014*** through January 2015 – delivered the month subsequent

to charge-off" and that did not contain an "exclusion reason, judgment, or dismissed [bankruptcy]." *Id.* (emphasis added).

However, as a subset of the overall 13,996 mischaracterized Accounts, 5,764 out of the 13,996 Accounts were classified in Conn's Internal Data as "Uncollected Charge-Offs" or "Flow 2", but that had a charge-off date prior to October of 2013. *See* Exhibit 16 at ¶ 17.

- 1,000 Accounts classified as "Uncollected Charge-Offs" in Conn's Internal Data were charged-off between years 1982 through 1999. *Id.* at ¶ 18.

- 919 Accounts classified as "Uncollected Charge-Offs" in Conn's Internal Data were charged-off between years 2000 through 2004. *Id.*

- 1,083 Accounts classified as "Uncollected Charge-Offs" in Conn's Internal Data were charged-off between years 2005 through 2009. *Id.*

- 1,749 Accounts classified as "Uncollected Charge-Offs" in Conn's Internal Data were charged-off from January 2010 through September 2013. *Id.*

- 44 Accounts classified as "Flow 2" in Conn's Internal Data were charged-off between years 1982 through 1999. *Id.* at ¶ 19.

- 133 Accounts classified as "Flow 2" in Conn's Internal Data were charged-off between years 2000 through 2004. *Id.*

- 381 Accounts classified as "Flow 2" in Conn's Internal Data were charged-off between years 2005-2009. *Id.*

- 455 Accounts classified as "Flow 2" in Conn's Internal Data were charged-off from January 2010 through September of 2013. *Id.*

TFLoanCo's expert separately cross-referenced these 5,764 old, mischaracterized Accounts with the Accounts listed in the Bills of Sale for the Bulk Delivery, Delivery (Flow) 1, and Delivery (Flow) 2. *Id.* at ¶ 20. She determined that TFLoanCo paid exactly $727,419.01 for those Accounts. *Id.*

13

### ARGUMENT

**I.    TFLoanCo is entitled to partial summary judgment on its breach of contract claim.**

    **A.    Conn breached its representations and warranties with respect to the 26,418 RSA Accounts as a matter of law.**

Conn made several representations and warranties in the PSA with respect to the 53,779 Accounts.   Among other things, in Article VIII of the PSA, Conn expressly "represent[ed], warrant[ed] and covenant[ed]" that:

- Conn "complied with all laws, rules, regulations … to which it may be subject …" (Exhibit 1 at p. 12, § 8.1);

- "The Accounts have been originated, serviced, and collected in accordance with all applicable law." (*Id*. at p.13, § 8.5);

- "[E]ach Account represents the valid, enforceable, legal and binding obligation of each Obligor …." (*Id*. at p. 13, § 8.6);

- "The information included in the applicable Computer File as of the date the Computer Files are transferred are materially accurate …" (*Id*. at p. 13, § 8.7); and

- "Account Documents provided pursuant to Section 3.2 are accurate in all material respects." (*Id*. at p. 13, § 8.9).

Conn breached these representations and warranties with respect to the 26,418 RSA Accounts, because under both common law and statutory prescription, Conn – at all times – was legally required to credit back, refund, or rebate to the consumer's Account debt the prorated purchase price of the cancelled RSAs for any unearned/unused time period existing at the time of charge-off.

Under the common law, a consumer would be entitled to a credit against his/her Account debt under basic principles of restitution and unjust enrichment.   Conn cannot cancel/rescind a RSA and then retain the benefit of the unearned/unused purchase price.   As the Texas Supreme Court has recognized, "rescission is not a one-way street." *Cruz v. Andrews Restoration, Inc.*, 364

S.W.3d 817, 824 (Tex. 2012) ("Rescission is merely the "common, shorthand name" for the composite remedy of rescission and restitution."). Rather, it "is mutual:  a plaintiff seeking to be restored to the status quo ante must likewise restore to the defendant whatever the plaintiff has received in the transaction." *Id.* (quoting Restatement (Third) of Restitution and Unjust Enrichment § 37 cmt. d (2011)).  Thus, when Conn cancels a RSA with time remaining, it cannot retain the benefits it received (i.e., the unearned/unused portion of the RSA purchase price); Conn must restore it to the consumer, here, in the form of a credit against the consumer's Account debt. *See, e.g.*, *Boyter v. MCR Const. Co.*, 673 S.W.2d 938, 941 (Tex. Civ. App.—Dallas 1984, writ ref'd n.r.e.); *David McDavid Pontiac, Inc. v. Nix*, 681 S.W.2d 831 (Tex. App.—Dallas 1984, writ ref'd n.r.e.); *Cas. Reciprocal Exch. v. Bryan*, 101 S.W.2d 895 (Tex. Civ. App.—Eastland 1937, no writ).

The Texas legislature has even given statutory recognition to these common law principles in the Texas Service Contract Regulatory Act, TEXAS OCCUPATIONS CODE §1304.001 et seq. (the "TSCRA").  Initially enacted in 2001 and effective June 1, 2003, the TSCRA regulates, among other things, companies like Conn, who sell service contracts[7] like RSAs. *Id.* at §§ 1304.101-105.

In 2011, the TSCRA was amended regarding the regulation of providers, administrators, and sellers of service contracts.  The 2011 amendments statutorily recognized common law principles of unjust enrichment and rescission and restitution, statutorily requiring restitution to consumers in the amount of the prorated purchase price of service contracts that are cancelled with time remaining.  *See* Acts 2011, 82nd Leg., ch. 1081 (S.B. 1169), § 1.01 (the "Act").  Specifically, the Act provided:

---

[7]       A "service contract" is "an agreement that is entered into for a separately stated consideration and for a specified term under which a provider agrees to … repair, replace, or maintain a product, or provide indemnification for the repair, replacement, or maintenance of a product, for operational or structural failure or damage caused by a defect in materials or workmanship or by normal wear …." TEX. OCC. CODE § 1304.003(a)(2).

Section 1304.159, Occupations Code, is amended by amending Subsection (b) and adding Subsection (c) to read as follows:

(a)      A provider may cancel a service contract by mailing a written notice of cancellation to the service contract holder at the service contract holder's last known address according to the records of the provider.  The provider must mail the notice before the fifth day preceding the effective date of the cancellation. The notice must state the effective date of the cancellation and the reason for the cancellation.

(b)  The provider is not required to provide prior notice of cancellation if the service contract is canceled because of:

(1)  nonpayment of the consideration for the contract;

(2)  fraud or a material misrepresentation by the service contract holder to the provider or the provider's administrator; or

(3)  a substantial breach of a duty by the service contract holder relating to the covered product or its use.

(c)  A service contract holder whose contract is canceled by the provider in accordance with this section is entitled to a prorated refund of the purchase price of the contract reflecting the remaining term of the contract, based on mileage, time, or another reasonably applicable measure of the remaining term that must be disclosed in the contract, decreased by the amount of any claims paid under the contract.  A provider who cancels a contract under this section may not impose a cancellation fee.

*Id*. at Section 1.16(c); TEX. OCC. CODE § 1304.159.

Due to the additions in Subsection (c) requiring that the applicable measure be disclosed in the service contract, the Act provided that Section 1.16(c) apply only to a service contract sold or issued on or after January 1, 2012.  *See* the Act at Section 1.16(c).  It expressly recognized, however, that "a service contract sold or issued before that date is governed by the law in effect on the date the contract was sold or issued, and the former law is continued in effect for that purpose."  *Id*.  Stated another way, the TSCRA has modified the common law requirements of notice and tender (Section 1304.159(b)) and statutorily recognized common law principles of

16

unjust enrichment and restitution and rescission (Section 1304.159(c)).[8]

Conn's failure to comply with its duties under the common law and TSCRA have also resulted in two serious problems.  First, the parties' agreed the purchase price of the Accounts would be determined by multiplying the unpaid balance due and owing on any individual Account with certain percentages.  *See* Exhibit 1 at p. 3 (definition of "Purchase Price").  As a result of Conn's failure to properly credit the Accounts with the prorated purchase price of the cancelled RSAs for any unearned/unused time period existing at the time of charge-off, including the prorated portion of applicable sales tax associated with the consumers' purchase of the RSAs, the account balances were inflated, and TFLoanCo overpaid for 26,418 Accounts.

Second, and exceedingly problematic, because Conn sold TFLoanCo 26,418 Accounts that do not accurately and legally reflect the true and correct balances due and owing, any efforts or attempts to collect such amounts could run afoul of the federal Fair Debt Collection Practices Act (the "FDCPA"), and any similar state fair debt collection laws that may apply to each Account.

Generally, the FDCPA prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  Specifically, a violation of Section 1692e can occur where a debt collector misrepresents the "***character, amount, or legal status of any debt***."  15 U.S.C. § 1692e(2)(A) (emphasis added).  "The FDCPA is a remedial statute, and . . . its language [is construed] broadly so as to effect its purposes."  *Allen ex rel. Martin v. LaSalle Bank, N.A.*, 629 F.3d 364, 367 (3d Cir. 2011) (internal

---

[8]    The history of the TSCRA and its statutory recognition of principles that previously existed (and still exist) at common law is important because when it comes to calculating TFLoanCo's damages, TFLoanCo anticipates Conn will argue it was not required to provide prorated refunds or credits to consumers for (cancelled) RSA's originated prior to the effective date of Section 1304.159(c), i.e., January 1, 2012.  In other words, Conn may argue that prior to the Act, it could be unjustly enriched, and therefore, not all of the 26,418 RSA Accounts constitute a breach of its representations and warranties contained in the PSA.  If Conn makes this specious argument, TFLoanCo will provide additional briefing on the issue.

citations omitted).   Moreover, the FDCPA is "a strict liability statute to the extent it imposes

liability without proof of an intentional violation."  *Id*. at 368; *see also*, *Thompson v. Diversified*

*Adjustment Serv., Inc.*, 2013 WL 3973976, at *4 (S.D. Tex. July 31, 2013) (same).   Accordingly,

Conn has sold TFLoanCo 26,418 Accounts that pose serious FDCPA problems for TFLoanCo.

> **B.     Conn's misclassification of Accounts constitutes breaches of its representations and warranties.**

Section 2.4 of the PSA states:

> [Conn] and [TFLoanCo] acknowledge that the Bulk Delivery Delivery Schedule (the "***Initial Purchase***") consists of the following Account Classifications: "Fresh Charge-Offs", "Judgments" and "Dismissed Bankruptcies", and that, subject to Article VI, those are the only Account Classifications being purchased under the Initial Purchase.  [Conn] represents and warrants that all Accounts on each Account Schedule subsequent to the Initial Purchase will represent all of the charged-off Accounts of Seller and its affiliates with only the "Fresh-Charge Off" Account Classification that have not otherwise been sold by [Conn] under this Agreement.

*See* Exhibit 1 at p. 4, § 2.4.

Conn misclassified 13,996 Accounts.  Those 13,996 Accounts have different Account

Classifications in the three Bills of Sale when compared to the Account Classifications in Conn's

Internal Data.   *See* Exhibit 16 at ¶¶ 10-15.

1,033 of those 13,996 Accounts were conveyed in the Bills of Sale for Deliveries (Flows)

1 and 2 as "Fresh Charge-Offs."   Deliveries (Flows) 1 and 2 were supposed to constitute only

"Fresh Charge-Offs"; but according to Conn's Internal Data, 1,033 Accounts were really

"Judgments" or "Dismissed Bankruptcies."  *Id*. at ¶¶ 14-15.

Additionally, 5,764 out of the 13,996 Accounts were classified in Conn's Internal Data as

"Uncollected Charge-Offs" or "Flow 2", but that had a charge-off date prior to October of 2013,

with many Accounts having been charged-off in the 1980's and 1990's.  *Id*. at ¶¶ 17-19.  These

5,764 Accounts are contrary to Conn's representations of what type of Accounts were contained within these classifications.

### C.     TFLoanCo's "sole and exclusive remedy" is indeed its "sole and exclusive remedy," i.e., Conn must repurchase the affected Accounts.

It is well-settled, black letter Texas law that "contracting parties are free to specify in an agreement how damages will be calculated in the event of a breach." *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Texas), L.P.*, 449 S.W.3d 474, 479 (Tex. 2014); *see also*, *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 67 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Parties may also contractually agree to the measure of damages in the event of a breach"); *Fid. & Deposit Co. of Maryland v. Stool*, 607 S.W.2d 17, 24 (Tex. Civ. App.—Tyler 1980, no writ) ("[I]t is well established that parties having agreed upon the measure of damages for breach of their contract are accordingly bound."); *Buhler v. McIntire*, 365 S.W.2d 237, 239–40 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.) ("The general rule seems to be that parties having agreed upon the measure of damages for breach of their contract are accordingly bound.").

Here, Conn and TFLoanCo could not have been more clear and unambiguous.  Section 9.4 of the PSA states:

> **Repurchase of Accounts as Exclusive Remedy**.  Except for the indemnification remedies provided herein, [TFLoanCo] and [Conn] agree that, as to any breach by [Conn] of any of its representations or warranties in respect to any Account, [TFLoanCo]'s sole and exclusive remedy for damages other than third party claims arising out of such breach shall be [Conn]'s repurchase of such Account.

*See* Exhibit 1 at p.15, § 9.4.  Accordingly, as a matter of law, any breach by Conn of its representations or warranties in respect to any of the 53,779 Accounts purchased by TFLoanCo entitles TFLoanCo to its "sole and exclusive remedy" – Conn's repurchase of any such Account.

**D.      TFLoanCo is entitled to a judgment against Conn in the amount of $4,645,703.62 – representing the purchase price of 35,609 Accounts – minus any amounts collected by TFLoanCo on those 35,609 Accounts.**

TFLoanCo's expert compared (i) the 13,996 Accounts that have different Account Classifications in the Bills of Sale when compared to the Account Classifications in Conn's Internal Data, (ii) the 26,418 Accounts that had unexpired RSAs pending as of the date of charge-off, and (iii) 1,013 Section 6.1 buy-backs.[9]  *See* Exhibit 16 at ¶¶ 21-22.  Duplicate Accounts that appeared across these three categories were eliminated.  *Id.* at ¶ 22.  For example, if a certain Account was one of the 26,418 RSA Accounts and also one of the 13,996 misclassified Accounts, the Account was only counted once to prevent a double recovery.  After removing the duplicates, TFLoanCo's expert determined that there are 35,609 unique Accounts that should be repurchased by Conn.

These 35,609 Accounts were cross-referenced with the Bills of Sale for the Bulk Delivery, Delivery (Flow) 1 and Delivery (Flow) 2.  *Id.*  TFLoanCo paid exactly $4,645,703.62 for those 35,609 Accounts.  A true and correct list of the 35,609 Accounts and the amount TFLoanCo paid for them is contained TFLoanCo's expert's report under "List 4."  *See* Exhibit 16-1.  Although TFLoanCo is only seeking partial summary judgment at this time, TFLoanCo is ultimately entitled to a final judgment that it have and recover against Conn $4,645,703.62, minus any amounts TFLoanCo has collected on the 35,609 Accounts – an amount that will be supplemented and presented to the Court.  The ultimate final judgment against Conn should also state that upon final satisfaction and payment of the damages awarded against Conn, the 35,609 Accounts are automatically conveyed back to Conn, effecting TFLoanCo's "sole and exclusive remedy."

---

[9]      TFLoanCo asserted a counterclaim against Conn under Article 6 of the PSA for failing to repurchase Accounts that meet certain characteristics.  Conn contends there are only 1,013 Section 6.1 Accounts, as reflected in a spreadsheet produced by Conn entitled "2014.12.29 Conn_s (Updated) Buy Back Response.xlsx."

20

## II.     TFLoanCo is entitled to a summary judgment that Conn take nothing on its breach of contract claim.

Conn commenced this action against TFLoanCo, claiming TFLoanCo breached the PSA when it failed to purchase additional accounts on August 28, 2014.  Conn's claim should be summarily dismissed because TFLoanCo was not required to close and purchase additional accounts.

Section 10.2 of the PSA (entitled "**Conditions Precedent to Purchase or Sale of Accounts**") states:

> [Conn] and [TFLoanCo] will be obligated to transfer Accounts on a Closing Date *only if* (i) the representations and warranties of [TFLoanCo] or [Conn], respectively, in this Agreement are true and correct *as of such Closing Date*; and (ii) [TFLoanCo] or [Conn], respectively, has complied in all material respects with any obligation to be performed by it on or prior to such Closing Date."

*See* Exhibit 1 at p. 16, § 10.2 (emphasis added).

It is undisputed that as of August 28, 2014, Conn's representations and warranties were not true and correct.  26,418 Accounts purchased by TFLoanCo in April and May of 2014 were sullied by the RSA issue, and 13,996 Accounts had been mischaracterized and misrepresented.  *See* Section I, *supra*.  TFLoanCo was not required to invest millions of more dollars in additional junk accounts, and it is not required to pay damages to Conn after Conn jettisoned those junk accounts to Sherman.  Conn's representations and warranties were patently false, and TFLoanCo is entitled to summary judgment that Conn take nothing on its claims.

### CONCLUSION AND PRAYER

TFLoanCo respectfully requests that the Court grant this motion for partial summary judgment, and enter an order that (1) Conn take nothing against TFLoanCo on its claims; (2) Conn's claims and causes of action are dismissed with prejudice; (3) Conn breached its

representations and warranties with respect to the 26,418 RSA Accounts as a matter of law; (4) Conn breached its representations and warranties with respect to the 13,996 mischaracterized Accounts as a matter of law; (5) TFLoanCo's "sole and exclusive remedy" for Conn's breach of its representations and warranties with respect to the aforementioned Accounts is Conn's repurchase of such Accounts; (6) there are 35,609 unique Accounts that should be repurchased by Conn; and (7) TFLoanCo will be entitled to have and recover $4,645,703.62 against Conn, minus any amounts TFLoanCo has collected on the 35,609 Accounts.

Date:   March 18, 2016                                    /s/ *Michael A. Ackal, III*
                                                         J. Cary Gray, Lead Attorney
                                                         Texas State Bar No. 08322300
                                                         E-mail: cgray@grayreed.com
                                                         Michael A. Ackal, III
                                                         Texas State Bar No. 24045367
                                                         E-mail: mackal@grayreed.com
                                                         Preston T. Kamin
                                                         Texas State Bar No. 24062817
                                                         E-mail: pkamin@grayreed.com
                                                         GRAY REED & MCGRAW, P.C.
                                                         1300 Post Oak Blvd., Suite 2000
                                                         Houston, Texas 77056
                                                         (713) 986-7000 (Telephone)
                                                         (713) 986-7100 (Facsimile)

                                                         ATTORNEYS FOR DEFENDANT
                                                         TF LOANCO III, LLC

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 18, 2016, a true and correct copy of the foregoing document was served upon the following individuals via the Court's ECF system pursuant to Federal Rule of Civil Procedure 5(b)(3):

J. Thad Heartfield
M. Dru Montgomery
THE HEARTFIELD LAW FIRM
2195 Dowlen Road
Beaumont, Texas 77706

*Michael A. Ackal, III*
Michael A. Ackal, III

## NOTICE PURSUANT TO LOCAL RULE CV-5(a)(7)(A)

Pursuant to Local Rule CV-5(a)(7)(A), Exhibits 2, 14 and 16-1 are being filed under seal. A motion to seal Exhibits 2, 14 and 16-1 has been filed on this 18th day of March, 2016.

*Michael A. Ackal, III*
Michael A. Ackal, III